IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Allstate Property and Casualty Insurance Company a/s/o Duane and Sheri Koons<br><br>Plaintiff<br>v.<br><br>Haier US Appliance Solutions, Inc. d/b/a GE Appliances and General Electric Company<br><br>Defendants | Civil Action No: 1:20-cv-00365-CCC<br><br>(Hon. Christopher C. Conner, J.)<br><br>JURY TRIAL DEMANDED |

**BRIEF IN SUPPORT OF
DEFENDANTS' DAUBERT MOTION
TO PRECLUDE PLAINTIFF'S EXPERT, ROGER SPADT,
FROM OFFERING OPINIONS REGARDING THE CAUSE OF THE FIRE**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | PROCEDURAL HISTORY………………………………………………… | 1 |
| II. | STATEMENT OF FACTS……………………………………………….. | 1 |
| | 1. The Incident……………………………………………………….. | 1 |
| | 2. The Opinions of Plaintiff's Expert, Roger Spadt…………………….. | 2 |
| III. | STATEMENT OF QUESTIONS INVOLVED……………………………… | 3 |
| IV. | ARGUMENT……………………………………………………………… | 3 |
| | 1. The Daubert Standard……………………………………………… | 3 |
| | 2. Mr. Spadt lacks the qualifications to offer opinions that gas accumulation ignited by the refrigerator caused the fire…................................................ | 4 |
| | 3. Mr. Spadt also lacks a reliable methodology regarding gas accumulation and the refrigerator………………………………………………… | 7 |
| |     a. Mr. Spadt has simply "parroted" the opinions of Mr. Zazula regarding gas accumulation……………………………………….. | 8 |

i

        b.      Mr. Spadt's 'negative corpus' methodology in identifying the refrigerator as an ignition source is contrary to the scientific method and rejected by federal courts……………………………….. 11

**V.**    **CONCLUSION**…………………………………………………………….. 15

**I.    PROCEDURAL HISTORY**

This is a products liability and subrogation action in which Plaintiff Allstate claims that an allegedly defective GE-brand range caused fire to the home of Plaintiff's insureds, Duane and Sheri Koons. Plaintiff originally filed suit in the Court of Common Pleas of Lebanon County, Pennsylvania. Defendants timely removed the case to this Court on March 2, 2020, on the basis of diversity jurisdiction. The parties have since completed fact and expert discovery.

Defendants now submit the instant Daubert motion, challenging the causation opinions of Roger Spadt. Defendants are contemporaneously filing two other Daubert motions, as well as a Motion for Summary Judgment.

**II.    STATEMENT OF FACTS**

*1.    The incident*

On June 9, 2018, a fire occurred at 1780 Ashton Drive, Lebanon, PA 17046. The homeowners, Duane and Sheri Koons, were on vacation at the time of the fire, having left the home at approximately 3:30 p.m. two days earlier. See Report of Roger Spadt, attached hereto as Exhibit "A," at 7. There is conflicting testimony regarding whether the burner control knobs were turned to the "On" position at the time of the fire. See e.g. id. at 8 (Fire Chief Vragovich told Mr. Koons that two of the knobs had been found to be on); but see Deposition transcript of Duane Koons, attached hereto as Exhibit "B," at 42:7-42:22 (Chief Vragovich told Mr. Koons "I don't know if one of us bumped it" and "I don't know if, in fact, it's from the hose, or whatever it might have been."); id. at 40:24-42:6 (when Chief Vragovich told him the stove knobs may have been slightly turned Mr. Koons replied, "It's impossible."); see also Deposition testimony of Sheri Koons, attached hereto as Exhibit "D," at 81:10-16 (no basis to doubt the burner control knobs were off when she left the home).

Nonetheless, Allstate alleges that the burner control knobs on the range were susceptible to accidental activation. See Complaint, attached hereto as Exhibit "C," at ¶ 13. Plaintiff's theory, contrary to the Koonses' sworn testimony, is that Mr. or Mrs. Koons accidentally activated the burner control knobs prior to leaving for vacation, and gas from the GE range flowed into the kitchen for approximately two days before being ignited by the Koonses' refrigerator. In support of this theory, Allstate produced the report of fire investigator Roger Spadt.

2.     *The opinions of Plaintiff's expert, Roger Spadt*

Despite admitting that he is not an expert in gas ranges, gas accumulation, or refrigerators, Mr. Spadt concluded that fugitive gas flowed from the range's burner valves, accumulated over two days, and was "likely" ignited by the operating refrigerator. See Exhibit "A," at 12. This theory is contradicted by the Koonses, who denied accidentally activating the range prior to leaving for vacation. See Exhibits "B" and "D", *supra*. Mr. Spadt never tested the the burner knobs to determine potential gas flow or its ability to accumulate over a two-day period. See Deposition testimony of Roger Spadt, attached hereto as Exhibit "E," at 194:22-195:9.

To reach his conclusion, Mr. Spadt described a walk-through of the premises, where he identified smoke and heat progression in several rooms, seemingly originating from the kitchen. See Exhibit "A," at 4. Mr. Spadt then determined that the fire originated in the kitchen, and more specifically, the area around the GE range at issue. Id. Once in the kitchen, Mr. Spadt describes a process of elimination through which he considered various hypothesized ignition sources and "disproves" each in turn. Id. at 9-11. Once Mr. Spadt arrived at the refrigerator as a hypothesized ignition source of the fire, his analysis ended. He never performed any testing of the refrigerator, much less move it, inspect its inner workings, or even glance behind it. See Exhibit "E," at 203:21-204:19. This process of elimination without independent verification of the ignition source,

2

whereby an investigator concludes, "I've eliminated everything else, so this is the cause," is known as *negative corpus*, and is expressly disfavored by the NFPA 921 and federal courts throughout the country.

Defendants now bring the instant Daubert motion to challenge Mr. Spadt's causation opinions, and specifically, the conclusion he adopted from Michael Zazula that fugitive gas flowed from the range's burner valves, accumulated over two days, and was ignited by the refrigerator. As will be discussed more fully below, Mr. Spadt's fire investigation and firefighting experience falls short of Rule 702's requirements for this case; therefore, and by his own admission he is not qualified to offer opinions regarding gas accumulation and subsequent ignition. Mr. Spadt's causation opinions should also be precluded because he lacks the requisite methodology in forming his conclusions – namely, because he simply "parroted" the opinions of Michael Zazula and utilized a disfavored, unscientific methodology in determining the fire's ignition source.

### III. STATEMENT OF QUESTIONS INVOLVED

(1) Should Roger Spadt be precluded from offering testimony that fugitive gas was ignited by the refrigerator, when, by his own admission, he lacks the qualifications to offer opinions on that topic?

(2) Should Roger Spadt be precluded from offering testimony that fugitive gas was ignited by the refrigerator, when that conclusion is unsupported by any reliable methodology?

*Suggested Answers (1-2):* **Yes.**

### IV. ARGUMENT

*1. The Daubert standard*

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the United States Supreme Court established a "gate keeping role for the judge" in applying Federal Rule of Evidence 702, the purpose of which is "to make certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). The proponent of an expert's testimony must prove, by a preponderance of the evidence, that his testimony is reliable under Daubert. Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d Cir. 2000) (citation omitted).

The Third Circuit has defined the requirements of Rule 702 under Daubert as a "trilogy" requirement: qualification, reliability, and fit. Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003). In other words:

1. the witness proffered to testify to specialized knowledge must be an expert;
2. the expert must testify to reliable scientific, technical, or other specialized knowledge; and
3. the expert's testimony must assist the trier of fact, *i.e.*, it must "fit" the facts of the case at hand.

See In re Paoli R. R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994) ("Paoli II"). The proponent of the expert testimony must make a detailed showing of scientific validity and cannot rely on mere conclusory allegations to that effect. See In re Paoli R. R. Yard PCB Litig., 916 F.2d 829, 858 (3d Cir. 1990) ("Paoli I"). This standard requires more than a mere *prima facie* showing by the plaintiff. See Paoli II, 35 F.3d at 743 n.9.

2. *Mr. Spadt lacks the qualifications to offer opinions that gas accumulation ignited by the refrigerator caused the fire.*

In determining whether a witness is qualified to provide expert testimony under Federal Rule of Evidence 702, the court must first determine whether he or she possesses "specialized knowledge." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) (*quoting* Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)). Although this requirement is interpreted liberally, "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average

4

layman." Id. (citations omitted). An expert's "specialized knowledge" alone, however, is not sufficient to satisfy Rule 702. Rather, the specialized knowledge must relate to the area of testimony. Fedor v. Freightliner, Inc., 193 F. Supp. 2d 820, 828 (E.D. Pa. 2002).

According to his curriculum vitae, Mr. Spadt has been a "fire investigator" with Technical Fire Analysis, LLC since 2015. See Curriculum Vitae of Roger Spadt, attached hereto as Exhibit "F." He has worked in different capacities for the Lehigh Township Volunteer Fire Company since 1990, including Fire Chief (from 1990-2007) and Fire Marshal (from 1993-present). He has been an Assistant to Pennsylvania State Police Fire Marshal since 1990, and since 2001, he has been a firefighter/paramedic for the City of Reading Department of Fire and Rescue Services.

However, according to Mr. Spadt himself, he is *not* an expert in the fields of gas, gas accumulation, gas ranges, gas range design, or propane incidents. Nonetheless, Mr. Spadt concludes that the GE range leaked gas that accumulated for two days before being ignited, causing this subject fire. Specifically, regarding his qualifications and how that lack of expertise prevented him from explaining his opinions, Mr. Spadt testified:

> Q: And why did you think that [i.e., the range knobs being on] was questionable failure?
>
> A: When I did my investigation, there was a lot of hypothesis, there were two knobs found in the not off positions and on positions and at that time not being a range expert, I didn't know if that was a potential failure or a cause of this fire.
>
> Q: You're still not a range expert, correct?
>
> A: Correct.

See Deposition Transcript of Roger Spadt, attached hereto as Exhibit "E," at 83:17-84:3; see also id. at 44:18-23 (agrees that he is not an expert in gas ranges or gas range design); see also id. at 190:10-13 ("But as I said earlier, not being an expert on ranges and propane and gasses, that's

5

where I relied on consulting with Mr. Zazula."); see also id. at 203:2-3 ("That's a question I cannot answer. I'm not the gas expert, as I said."); see also id. at 167:19-21 ("But as I said earlier, I'm not an expert on range failures or propane incidents.").

Mr. Spadt testified similarly when asked to explain his conclusion that the refrigerator has ignited the fire. See id. at 196:13-18 ("The refrigerator was operational and not being an expert on the functions of refrigerators, I talked with Mr. Zazula, would that be a competent ignition source of the fugitive gas in the kitchen."); see also id. at 233:23-234:4 ("As I said, I'm not an appliance expert and Mr. Zazula has done many appliance fires."); see also id. at 203 ("I'm not familiar with refrigerator operations.").

An expert's "specialized knowledge" alone is not sufficient to satisfy Rule 702. Rather, the specialized knowledge "must be relevant to the area of inquiry." Fedor, 193 F. Supp. 2d at 828. Here, while Mr. Spadt may be qualified to opine on the area of origin of the fire, he is certainly not qualified to opine that the fire was caused by two days of gas accumulation and ignition by a refrigerator. As the foregoing excerpts demonstrate, defense counsel's deposition questioning of Mr. Spadt was repeatedly frustrated by Mr. Spadt's admitted lack of expertise, and his resulting inability to explain or expand on the opinions he purportedly holds. By his own admission, Mr. Spadt is not qualified to explain his opinions regarding gas accumulation, or its apparent ignition by the refrigerator.

Defendants now ask this Court take Mr. Spadt at his word, and rule that he is not an expert in gas, gas ranges, appliances, or propane incidents, and therefore, preclude him from testifying that the fire was caused by an accumulation of gas ignited by the Koonses' refrigerator. See Yazdani v. BMW of North America, 188 F. Supp. 486, 491 (E.D. Pa. 2016) (precluding plaintiff's

6

fire investigation expert from opining on alternative designs of motorcycles when he admitted he was not an expert in the design of motorcycles).

    3.    *Mr. Spadt also lacks a reliable methodology regarding gas accumulation and the refrigerator.*

To be admissible, an expert's testimony must be reliable, that is to say, based on reliable methodology. See Oddi v. Ford Motor Co., 234 F. 3d 136, 144 (3d Cir. 2000) (citing Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993)). As one court put it: "If Daubert and its progeny require anything, it is that plaintiffs come forward with proof of a valid methodology based on more than just the *ipse dixit* of the expert." Pappas v. Sony Elecs., Inc., 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000). Put another way, an expert's opinion must be "based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003) (internal quotations omitted).

The courts of this Circuit have repeatedly found a lack of demonstrable methodology to be fatal to the admissibility of expert testimony. See, e.g., Oddi, 234 F.3d at 156, 158; see also Murray v. Marina Dist. Dev. Co., 311 F. App'x 521, 524 (3d Cir. 2008) (upholding exclusion of expert because he "fail[ed] to demonstrate any methodology, let alone peer-reviewed or generally accepted methodology" in support of his opinions); Furlan v. Schindler Elevator Corp, 864 F. Supp. 2d 291, 298 (E.D. Pa. 2012) (holding expert's opinions unreliable when he had conducted no tests, used little to no methodology beyond his own intuition, and applied no standards other than his own perception).

The Courts of this Circuit have frequently noted, and the Supreme Court has stated, that "conclusions and methodology are not entirely distinct from one another." See Oddi, 234 F.3d at 146 (quoting General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997)); Rapp v. Singh, 152 F.

7

Supp. 2d 694, 699 (E.D. Pa. 2001). A court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." Heller v. Shaw Industries, Inc., 167 F.3d 146, 153 (3d Cir. 1999). "A court may conclude that there is simply too great a gap between the data and the opinion proffered." Joiner, 522 U.S. at 146.

Here, Mr. Spadt lacks a reliable methodology in two respects. He has blindly relied upon, and adopted as his own, Michael Zazula's opinion that fugitive gas may have accumulated over a period of two days. Likewise, regarding the identification of the refrigerator as the ignition source, Mr. Spadt utilized the *negative corpus* methodology, which has been rejected by courts and the NFPA 921 alike. Therefore, as is more fully explained below, he lacks the requisite methodology under Daubert to testify as to the cause of the fire.

> a. Mr. Spadt has simply "parroted" the opinions of Mr. Zazula regarding gas accumulation.

Rules 702 and 703 permit an expert to rely on "facts or data . . . of a type reasonably relied upon by experts in the field," but not upon opinions developed by another expert without independent verification or validation of the underlying expert's work. Fed. R. Evid. 702, 703; In re TMI Litigation, 193 F.3d 613, 716 (3d Cir. 1999). An expert may rely on and testify concerning the opinions of other experts "only when the testifying expert has the specialized knowledge necessary to understand, corroborate, and articulate the science behind the opinion." Muhsin v. Pacific Cycle, Inc., 2012 WL 2062396, at *8 (D.V.I. June 8, 2012) (citing Dura Automotive Systems of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 612-614 (7th Cir. 2002)). An expert's blind reliance on the opinions of another expert, without independent assessment of the validity of those opinions, demonstrates a flawed methodology under Daubert because it is not calculated to produce reliable results. In re TMI Litig., 193 F.3d at 716.

The court's analysis in <u>Muhsin</u> provides guidance here. In <u>Muhsin</u>, a child was injured while riding his bicycle when the front wheel fell apart, causing injuries. See <u>Muhsin</u> at *1. Plaintiff produced the expert report of a civil engineer with extensive experience involving reconstruction of bicycle accidents. <u>Id.</u> In his report, the expert indicated that the failed front wheel was provided to a metallurgist who examined and evaluated the fracture and discovered a significant manufacturing defect that weakened the wheel and resulted in the failure. <u>Id</u>. at*2. The report concluded that "[t]he causal factor of this accident was the improperly manufactured front wheel" of the bicycle. <u>Id.</u> The defendant challenged the engineer's expert report under <u>Daubert</u> because it simply regurgitated the opinions of the metallurgist and contained no independent testing or analysis to support the conclusions apart from the metallurgist's findings. <u>Id</u>. at *6-7.

Ultimately, the Court excluded the portions of the engineer's report that relied on the metallurgist's analysis, and precluded him from testifying that the wheel was defectively manufactured and that the alleged defect caused the accident. <u>Id.</u> at *10. The Court took issue with the fact that the engineer's causation opinion was based entirely on the metallurgist's findings; he performed no independent testing or analysis to verify those findings and could only refer to his discussions with the metallurgist; and he admitted he lacked the expertise to answer questions about the specifics, simply referring to the metallurgist's findings. <u>Id.</u> at *7.

Here, the situation is remarkably similar. Mr. Spadt has blindly relied upon, and adopted as his own, Michael Zazula's opinion that fugitive propane gas from the GE range flowed from the two burner areas and became fugitive gas within the area around and behind the range. When asked at his deposition how he arrived at that conclusion, Mr. Spadt stated he was relying on consultation with Mr. Zazula:

> Q: Now, would you agree with me you don't actually reach that conclusion in this report?

9

>    A:   I reached it partially if the burner control knobs were on, could propane have come off. But as I said earlier, not being an expert on ranges and propane and gasses, that's where I relied on consulting with Mr. Zazula.

See Exhibit "E," at 190:5-13. However, when pressed on whether he independently verified the opinion, Mr. Spadt affirmed he did not:

>    Q:   Mr. Spadt, did you perform any calculations about how much gas had escaped from the GE range?
>
>    A:   I did not.
>
>    * * *
>
>    Q:   Did you do anything in this case to determine whether that threshold [the lower explosive limit][1] had been met?
>
>    A:   That was all Mr. Zazula's work with his calculations.
>
>    Q:   Did you do any testing to determine how much gas would escape from the GE range?
>
>    A:   I did none personally, no.

See id. at 193:10-13; 194:22-195:6. Mr. Spadt's utter lack of testing, observation or analysis is all the more remarkable given the lack of factual evidence supporting the conclusion he espouses. There is no evidence that the burner control knobs were emitting gas – indeed, the homeowners deny it – but Mr. Spadt nevertheless identifies that as the cause of the fire without doing any corroborative work himself.

　　　Like the engineer in Muhsin, Mr. Spadt limited his consultation with Mr. Zazula to conversations, and could not explain the underlying calculations or data. Indeed, he never reviewed any of Mr. Zazula's calculations first-hand, and he admitted that Mr. Zazula did not detail his

---

[1] Mr. Spadt explained that the "lower explosive limit" is the "lower percentage of an item in the atmosphere that could be ignited" or, more simply, the threshold amount of gas in the air required to catch fire. See Exhibit "E," at 193:14-194:19.

10

calculations with him during their discussion. See id. at 14. Finally, when asked whether he would learn anything from reviewing defense expert, Dr. Hoffman's calculations, Mr. Spadt indicated it would not change his opinions and he would "probably not" learn anything from them. See id. at 224; see also ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 293 (3d Cir. 2012) ("An expert's lack of familiarity with the methods and reasons underlying someone else's projections virtually precludes any assessment of the validity of the projections through cross-examination.") (internal quotations and punctuation omitted)).

Mr. Spadt has entered into a field in which he admits he is unqualified to give an opinion. His entire opinion rests upon an analysis prepared by Mr. Zazula. Mr. Spadt admits he performed no tests to independently verify Mr. Zazula's findings. He did not use Mr. Zazula's report as data upon which an expert in his field would reasonably rely to form an opinion, but rather, took Mr. Zazula's opinions at face value and used the report as substantive evidence of his ultimate conclusion. His lack of familiarity with Mr. Zazula's calculations and his disinterest in Mr. Hoffman's demonstrates his lack of qualifications to opine on these concepts. Indeed, he was uncomfortable discussing the concepts, data, and calculations at his deposition. As the ZF Meritor court makes clear, Mr. Spadt's lack of familiarity with this field precludes assessment of the validity of those opinions on cross-examination. Therefore, like in the factually similar Muhsin case, this Court should preclude Mr. Spadt's causation opinions at the time of trial.

> b.     *Mr. Spadt's 'negative corpus' methodology in identifying the refrigerator as an ignition source is contrary to the scientific method and rejected by federal courts.*

Mr. Spadt testified that the NFPA 921, Guide for Fire and Explosion Investigations, published by the National Fire Protection Association, guided his investigation of the fire. See Exhibit "E," at 64:3-66:3. Several courts, including in this circuit, have recognized the NFPA 921

methodology to be reliable for purposes of Rule 702. See e.g. Booth v. Black & Decker, Inc. 166 F. Supp. 2d. 215, 220 (E.D. Pa. 2001); McCoy v. Whirlpool Corp., 214 F.R.D. 646, 653 (D. Kan. 2003) (describing the NFPA 921 as the "gold standard" for fire investigations). However, it is grounds for preclusion if an expert states he relied on NFPA 921 to guide his investigation, but then fails to faithfully apply it. See State Farm Fire & Cas. Co. v. Steffen, 948 F. Supp. 2d 434, 443 (E.D. Pa. 2013) (precluding plaintiff's cause and origin expert evidence for failure to faithfully apply the NFPA 921 procedure by utilizing a *negative corpus* methodology).

While Mr. Spadt testified that the NFPA 921 guided his investigation, a closer review of his expert report reveals he utilized the *negative corpus* method. The NFPA 921 explicitly rejects *negative corpus* as a reliable methodology. Specifically, Mr. Spadt lists "ignition source hypotheses considered and tested," and briefly pronounces how he "disproved" several alternative ignition sources, such as the microwave oven and the range hood. See Exhibit "A," at 9-11. After discounting these other potential ignition sources, Mr. Spadt arrived at the GE range and the upright refrigerator, and determined the range "was not disproved as a source for the propane fugitive gas within the kitchen" and the refrigerator "was not disproved as the ignition source of the propane fugitive gas for this fire." Id. at 11. Problematically, and contrary to the directives of NFPA 921, Mr. Spadt reached this conclusion without making any affirmative observation that the refrigerator ignited the fire, or indeed any observation of the refrigerator at all. Oddly enough, Mr. Spadt admits he never even inspected the fridge. See Exhibit "E," at 203:21-204:19.

As stated above, the NFPA rejects this *negative corpus* methodology as antithetical to a proper scientific method. Specifically, the 2017 Edition of the NFPA 921 § 19.6.5, states:

> Identifying the ignition source for a fire by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists, is referred to by some investigators as *negative corpus*. . . . **The negative**

12

> **corpus process is not consistent with the scientific method, is inappropriate, and should not be used because it generates untestable hypotheses, and may result in incorrect determinations of the ignition source and first fuel ignited.** Any hypotheses formulated for the causal factors (e.g., first fuel, ignition source, and ignition sequence), must be based on the analysis of facts and logical inferences that flow from those facts. Those facts and logical inferences are derived from evidence, observations, calculations, experiments, and the laws of science. Speculative information cannot be included in the analysis.

See Relevant Excerpt of 2017[2] Edition of NFPA 921, attached hereto as Exhibit "G"; see also Steffen, 948 F. Supp. 2d at 443 (E.D. Pa. 2013) (quoting a prior version of NFPA 921 relating to the impropriety of *negative corpus* and finding plaintiff's cause and origin expert evidence inadmissible under Daubert, in part, because the expert failed to faithfully apply the NFPA 921 procedure and scientific method by utilizing a *negative corpus* methodology); Booth v. Black & Decker, Inc., 166 F. Supp. 215, 220 (E.D. Pa. 2001) (a simple reference to the NFPA 921, without identification of a specific methodology within it, is not sufficient to render the testimony admissible).

In speculatively concluding that "fugitive propane gas was likely ignited by the operating refrigerator," Mr. Spadt's investigation impermissibly relies on precisely this untestable *negative corpus*, even though the NFPA 921 protocol that he purports to have followed specifically identifies the approach as inconsistent with the scientific method. Mr. Spadt's failure to faithfully apply the NFPA 921 procedure and scientific method by utilizing the *negative corpus* methodology means there is "too great an analytical gap" between his methodology and ultimate conclusion as to the fire's cause. As such, it is inherently unreliable and should be precluded. See Fed. R. Civ. P. 702(d); Joiner, 522 U.S. at 146; Steffen, 948 F. Supp. 2d at 443 (failure to follow NFPA 921, and *negative corpus* specifically, is grounds for preclusion).

---

[2] The 2017 Edition of the NFPA 921 was the applicable edition when Mr. Spadt conducted his investigation.

Like his opinions relating to the accumulation of gas over two days, Mr. Spadt also simply parrots the opinions of Mr. Zazula relating to the refrigerator. He indicated in his deposition that he is not an expert on the functions of refrigerators, and instead, simply asked Mr. Zazula if the refrigerator would be a competent ignition source of fugitive gas. See id. at 196:9-18. Despite apparently agreeing with Mr. Zazula's conclusion that the refrigerator was the "likely" ignition source of fugitive gases, Mr. Spadt admits he never actually inspected the refrigerator:

> Q: During your exam or any of your exams, did you move the refrigerator?
>
> A: I did not.
>
> Q: Did anyone present at the exams move the refrigerator?
>
> A: No.
>
> Q: Did you or anyone else look behind the refrigerator?
>
> A: No.
>
> Q: Did you or anyone else examine the internal components of the refrigerator?
>
> A: No.
>
> Q: Did you or anyone else look at the compressor of the refrigerator?
>
> A: No.
>
> Q: Did you make any affirmative observations that it had sparked the fire?
>
> A: Me personally, no.
>
> Q: Do you know if Mr. Zazula made any observations that it had sparked the fire?
>
> A: I can't speak for his observation, sir.

See Exhibit "E," at 203:21-204:19.

Mr. Spadt's methodology, or lack thereof, in concluding that the refrigerator "likely" ignited fugitive gases from the GE range is purely speculative. He improperly relied upon a *negative corpus* to identify the refrigerator as a potential ignition source. Once he "counted out" all other possible ignition sources and arrived at the refrigerator, Mr. Spadt's analysis ended there. He did not move the refrigerator, look behind it, inspect the compressor or any other internal components, and in fact did not make any affirmative observations that it had ignited the fire. This is not a reliable methodology under Daubert, and must be precluded. See Steffen, supra.

## V. CONCLUSION

Mr. Spadt's causation opinions in this case are not sufficient under Daubert. His failure to independently verify the data and calculations related to alleged gas accumulation, combined with his own admissions that he is not an expert in those areas, makes him unqualified to testify regarding those conclusions to the jury. Furthermore, Mr. Spadt's methodology was flawed due to his reliance on the disfavored, unscientific *negative corpus* and his failure to inspect the refrigerator which he claims ignited the fire. These purely speculative opinions, which are in no way based in science or any other reliable methodology, should not be presented to the jury.

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

By: */s/ Michael A. Salvati*
MICHAEL A. SALVATI
Attorney ID. No. 311682
Attorney for Defendants
2000 Market Street, Suite 2300
Philadelphia, PA  19103
215-575-4552 (P) / 215-575-0856 (F)
masalvati@mdwcg.com